Johnson, C. J.
As the bill of exceptions is not properly made part of the record, we are not required to examine it.
"We have done so, however, and may say that if it were properly of record the result would not be changed.
The single question is: Can the owners of stock in this company, which was formerly the property of the state, vote the same at elections on an equality with the other shareholders ?
Respondents claim that owners of such stock must hold .a separate election and elect three directors. They base this claim on the provisions of the act of March 20, 1840 (1 Curwen, 619, chap. 467), and the amendatory act of March 29, 1841 (1 Curwen, 796); claiming that upon an accceptance by the company of those acts, the stock then •owned by the state was forever divested of its voting power, even in the hands of private holders, who purchased from the state.
This turnpike company was organized under a special ■charter, granted March 3, 1834 (32 Ohio L. 351). By the 18th section of that act it was provided “ that nothing in this act contained shall be so construed as to prevent any future legislature from altering or amending this act.” The maximum capital was fixed at $300, 000,' and the stockholders were to elect nine directors,” each stockholder having one vote for each share he may ■own.”
In matters not otherwise provided for in this charter, the company came under the general law to provide for the *294 regulation of turnpike companies, passed January 17,1817' (1 Curwen, 466).
Under the provisions of “ an act to authorize a loan of the public credit by the State of Ohio,” etc. (1 Curwen, 330), commonly known as the “ Plunder Law,” passed March 24, 1837, the state became the owner of the stock •now in controversy. As such owner, the state was, like all other stockholders, entitled to cast one vote, for each share,, for nine directors, at the same election with other stockholders. This continued until the act of March 20, 1840 (1 Curwen, 620), was passed, regulating the elections in railroad, turnpike, canal, and slackwater navigation companies, “ when the state is a stockholder.” In that act the state proposed to surrender her right to vote as other stockholders, and reserve in lieu thereof the power in the governor to appoint three directors out of the nine, leaving' the other six to be. elected by the private stockholders.
By the 4th section of the act of 1840, the option was given to such companies to accept this change in six months, but if not accepted, then the governor in person,, or by proxy, should represent and vote its stock, “ at all elections of directors and other officers, under the restrictions imposed by the charter of such company upon any other stockholder owning an equal amount of stock.”
This act was amended in some particulars, not material to notice in this case, March 29, 1841 (1 Curwen, 796).
The “ Plunder Law ” was repealed March 17, 1840 (1 Curwen, 619).
Erom the time the state became a stockholder, until the-acceptance by the company of the changes proposed by the-acts of 1840 and 1841, the rights of the state were the same as individuals as to voting at all elections, and the object of these statutes of 1840 and 1841, was to surrender this-equal right, if the companies consented thereto, and confer upon private stockholders the exclusive power to elect six directors.
*295 If the company did not accept the terms of these acts of 1840 and 1841, as therein prescribed, the state would continue to vote as other stockholders. Assuming that this company did so accept, the effect was to change the mode of selecting a board of directors, while the state continued to be a stockholder. It constituted an amendment of the act of incorporation as to elections, and deprived the state of its right to vote for nine directors, substituting in lieu thereof a power to appoint three uf the nine. Such amended charter was, by the power reserved in the original charter itself, subject to amendment. One amendment, like this, did not exhaust this power reserved, to a future legislature to alter or amend, whenever such legislature might think the public welfare demanded it.
Again, when the state became a stockholder with individuals it, like all other stockholders, possessed the power of alienation as absolutely as any private holder. This power of sale was untrammeled and might be exercised, whenever the state saw proper. There was nothiug in the charter of the company nor in the act under which this stock was subscribed, nor in these acts of 1840 or 1841, which limited the inherent power of the state to dispose of its stock, with or without conditions imposed on the transferee. These acts of 1840 and 1841 apply only “ where the state is a stockholder.” It was intended as a regulation in chosing directors while the state owned stock. "When the state ceases to be a stockholder, the reason for the statute ceased, and the act, by its express terms, ceased to apply.
After acceptance of the acts of 1840 and 1841, the state, through its legislature, possessed complete power—
1. To alien its stock with or without conditions imposed on the transferee.
2. To alter or amend the charter as to the mode of elect-ting directors, or to make any other amendment within the object and scope of the corporation, for the better regulation of such company. It can not be said, that such an *296 amendment violates any contract within the meaning of the federal constitution.
The power reserved to alter or amend the charter entered info and formed part of the terms of the contract, and the stockholders held their chartered privileges subject to its exercise. In matter of Reciprocity Bank, 22 N. Y. 1; Lee, Oliver & Co., 21 N. Y. 1; Buffalo & N. Y. R. R. v. Dudley, 4 Kern. 336; Hyatt v. Whipple, 37 Barb. 595; The City of Roxbury v. The B. R. R. Co., 6 Cush. 424; Sherman v. Smith, 1 Black. 587; Mayor, etc. v. Norwich R. R., 109 Mass. 183; Field on Corporations, §§ 48 to 54.
Under the act of 1837, commonly called the “Plunder Law,” the state had become the owner of stocks in numerous railroad, canal, turnpike, and other companies, organized for the internal improvement of the state.
The state exercised its right to alien its stock by a series of statutes.
The first to which our attention is called, relating to turnpike stocks, is the act of May 1, 1854 (4 Curwen, 2651).
It authorized an exchange of such stock for the funded debt of the state, or a sale to the highest bidder, but imposed no limitations upon the holder, as to his power to vote such stock, when the state ceased to be a stockholder.
An amendatory and supplementary act was passed January 12, 1859 (4 Cur. 3165), by which they were to be sold, in lots of not less than ten nor more than fifty shares.
In this act, for the first time, conditions were imposed on the stock in the hands of purchasers from the state.
Section 4 provided that “ The shares now owned by the state shall not entitle the person or persons to whom the same may be transferred, by virtue of this act, to vote at the annual election for directors now provided for in the charter of said company;” but authorizes such transferees to meet at the same time and place as other stockholders, and elect three directors. The respondents insist that this act governs in the present case.
The fact that this condition is expressly imposed on the *297 holders of such stock, and that they are divested of the right to vote as provided for in the original charter, is conclusive proof that the legislature did not suppose that the .acts of 1840 and 1841 had so changed the character of this •stock as to destroy its voting power when not owned by the state. The conditions imposed by the act of 1859 applied only to transferees by virtue of that act. It did not -extend to transferees by virtue of the act of May 1, 1854, nor to those holding under subsequent legislation.
The next legislation authorizing a sale is the joint resolution of April 13, 1865 (62 Ohio L. 220).
The fund commissioners were authorized to sell for cash at their market value, or if there be no market value, at such price as they may deem equal to the market value, all stocks owned by the state in turnpike companies.
This resolution contains specific provisions as to notice' •of sale, price, etc., and requires the commissioners to first offer it at public auction, in lots of not less than ten nor more than fifty shares, and if all is n<5t thus sold, then to offer in lots to suit purchasers at private sale.
Unless we examine the bill of exceptions, we can not know under which of the three statutes the stock of relators was sold or exchanged. ' Whether the relators derived title under the act of 1854 or of 1859, or the joint resolution of 1865, we are not advised. In the absence of that knowledge, we are not warranted in assuming that the purchase was under the act of 1859. For aught we know from the record, outside of the bill of exceptions, relator’s title accrued under the act of 1854 or under the joint resolution of 1865. If under either, they hold their stock freed from any limitations on their equal right to vote it.
The bill of exceptions, if examined, shows they purchased under the joint resolution of 1865.
Although the conditions imposed under the amendatory act of 1859 only apply to transferees under that act, yet plaintiffs in error claim it was still in force, that the resolution of 1865 did not repeal it, and that no sale could be *298 made under this joint resolution to which the conditions of the fourth section of the act of 1859 would not apply.
We do not assent to this view. The acts of 1854 and 1859 were a delegation of power to the fund commissioners to dispose of the stock owned by the state. By these acts-they were 'clothed with the power to sell or exchange this-stock. The act of 1859 stood unrepealed, and there was nothing to prevent a sale thereunder, if purchasers could be found. It had been in force for six years, and under it, doubtless much of the most valuable stocks owned by the state had been sold, and it became necessary, in order to dispose of the less salable, that more liberal terms should be offered.
Hence the powers of the fund commissioners were enlarged, and the terms modified by the joint resolution of 1865. The commissioners could sell all or part only of the stock. If part remained unsold, the power of the governor to appoint three directors remained. • This would be a denial of the right of transferees to elect three directors under the act of 1859.
One or two other questions are made, but as the term of office for which the directors were elected has long since expired, they are of no practical importance.

Judgment affirmed.

Scott, J., dissented from the seventh proposition of the syllabus and from the judgment in the case.